[L. A. No. 1294.    Department Two.—February 7, 1905.]

## HENRY LAMBERT, Respondent, v. SOUTHERN PACIFIC RAILROAD COMPANY, Appellant.

COLLISION AT RAILROAD CROSSING—CONTRIBUTORY NEGLIGENCE—NON-
SUIT.—It is contributory negligence, as matter of law, for one who is very deaf deliberately to drive a team upon a railroad crossing without looking to see whether or not a train was approach-

ing, where the track was visible to him for more than a quarter of a mile, and he could easily have avoided the collision; and in an action for damages for such collision for alleged negligence of the railroad company, a nonsuit should have been granted.

ID.—AVOIDANCE OF INJURY BY RAILROAD COMPANY.—The railroad company, whether it was originally negligent or not, was not responsible for failure to avoid the injury, notwithstanding plaintiff's contributory negligence, where it was not to be anticipated that plaintiff would cross the track, and would not check his horses to a place of safety, as he might have done, and there was no knowledge of plaintiff's deafness, and every effort was made to avoid the collision when his peril was discovered. There was no duty to stop the train, under the state of the evidence.

APPEAL from a judgment of the Superior Court of Santa Barbara County. William S. Day, Judge.

The facts are stated in the opinion of the court.

Canfield & Starbuck, for Appellant.

Benjamin F. Thomas, for Respondent.

HENSHAW, J.—This action was for damages. Plaintiff alleged that as he, with his wagon and two horses, was traveling on the public highway, at a point in the town of Summerland where it crosses the defendant's railroad, the defendant negligently, carelessly, and wrongfully ran a locomotive on to plaintiff's horses and wagon, and the plaintiff, killing the horses, breaking the wagon, and injuring plaintiff himself. The defense pleaded both a general denial and contributory negligence. At the close of plaintiff's evidence, and again at the close of all the evidence, defendant moved for the dismissal of the action or for a judgment of nonsuit, which motions were denied. From the judgment which was rendered upon the verdict of the jury in favor of plaintiff defendant appeals, and with its appeal presents a bill of exceptions.

The evidence is insufficient to sustain the verdict and judgment, and defendant's motion should have been granted. As might be expected, the strongest testimony for the plaintiff is that given by himself, and from this it appears that at the time of the trial he was a farmer sixty-seven years old, so deaf that he could not hear ordinary conversation, and his

testimony was given by question and answer in writing. He had resided about a mile and a half from the town of Summerland for about thirty years. He had driven horses all his life and at one time was a stage-driver. One of his horses he had driven over this road daily for about fourteen years; the other horse he had had a few months, and had driven him over the road in a buggy, but not very often. Neither had ever been frightened at the cars, and both had been near the cars. From the town of Summerland the railroad track and the main county road approach each other as one goes eastward, at an acute angle, until, at a distance of about seven hundred feet from the post-office, the highway crosses the railroad. The obstructions to the view of one traveling upon the highway are insignificant, the depot itself being the greatest of them, and one driving towards the crossing can, looking westward, easily see the track for from one quarter to one half a mile. To the left of the highway, and upon the side away from the track, at a point about opposite the crossing, is a road, and to the east of this road, and still opposite the crossing, the grade is such as easily to have permitted one to drive upon it, and thus avoid crossing the track. Upon the day of the accident plaintiff had stopped at the post-office to secure his mail. He left the post-office and started slowly toward the railroad. While driving along he was "glancing at the headlines of his newspaper . . . for a little way—for about twenty-five or thirty yards perhaps." When he had thus driven about fifty or sixty yards, "all of a sudden my horses became frightened and started off. I thought it was the cars, and I tried to hold them, which I was unable to do. When I had gone about one hundred yards, I looked to see where the cars were. I saw them over my right shoulder. I saw the engine; did n't see the string of cars; just saw the engine. I was within about thirty or thirty-five yards of the crossing. I pulled on the horses with all the strength I had, but I could n't hold them. They were soon on the track. There was no place where I could turn off—oil-derricks to one side. When the engine came near to them, my horses started off on a trot. They continued to trot until the collision with the engine. The horses became frightened about one hundred and fifty yards from the crossing as near as I could tell. I did n't hear no whistle or no bell. When I saw the engine,

the bell was hanging still. . I think I could have heard the bell if it had rung or the whistle if it had been sounded within eighty rods of the crossing. I have heard the whistle and heard the bell lots of times when I have been riding through Summerland before the accident. I could have heard the whistle or bell anywheres between the depot and the crossing."

It appears from numerous eye-witnesses to the accident that the horses were "just trotting along" at a rate of from four to six miles per hour, while the speed of the train was about twenty miles an hour. From plaintiff's own testimony, then, it appears that he became aware of the approach of the train when he was some one hundred and fifty yards distant from the crossing, and that his horses proceeded to trot toward the crossing, and that he could not stop them. It further appears that he thus had four hundred and fifty feet of distance to travel, with places and opportunity to have turned to the left and thus to have avoided the accident. The only reason he could assign for not doing so is the presence of oil-derricks, but it is made clearly to appear, as has been said, that there was a traveled street into which he could have turned, and that the condition of the land to the left of the highway was such that he could easily, and with safety, have driven his horses upon it. Besides the testimony of the plaintiff, there were three eye-witnesses to the accident called by him—Mr. Dewlaney, Mr. Hickey, and Mrs. Gibson. Mr. Dewlaney saw the plaintiff first when the latter was going east and was about five hundred feet west of the crossing. Plaintiff's horses were "trotting along," and it did not occur to Mr. Dewlaney that there was any likelihood of the accident until the plaintiff had gone about three hundred and fifty feet further, and was within a hundred and fifty feet of the crossing; that knowing that the engine was approaching, and knowing that the plaintiff was deaf, and not having seen him look around, Mr. Dewlaney stood up, saying: "There is a man who is likely to get run into." He then watched the plaintiff from that time until the collision. The plaintiff did not change the speed at which his horses were still trotting along, "a slow gait of about five or six miles an hour," and there was nothing to indicate to Mr. Dewlaney that there was any likelihood of an accident beside the two facts that he

knew the plaintiff was deaf, and did not see him look around up to the time when the collision took place. When quite near the track the horses apparently became frightened, but if the plaintiff had looked around he would have seen the train and would have had time to stop after Mr. Dewlaney had stood up and said the plaintiff was likely to get run into. Mr. Hickey, who was with Mr. Dewlaney, stood up and looked when Mr. Dewlaney made the remark that "There is a man who was likely to get run into," and saw the plaintiff when the latter was at a distance of about one hundred and fifty feet from the crossing. He was driving along the road at the rate of five or six miles an hour, and his horses were trotting. The train was making a good deal of noise, but Mr. Hickey, as well as Mr. Dewlaney, knew that the plaintiff was deaf, and plaintiff appeared to Mr. Hickey not to know that the train was approaching. Mrs. Gibson was picking flowers with her grandchild when she heard the rumble of the train. She looked up and was startled to see the plaintiff and the engine close together, just passing east of her. The collision took place almost immediately. Although she did not estimate the rate of speed of the plaintiff's horses, and could not say whether she could have seen any attempt on his part to stop them after he had passed by, she observed, as the plaintiff passed her, that the horses were "trotting along at an ordinary rate,"—not running away, but "just trotting along as horses will,"—and that "they did not show any signs of fright or increase their speed materially as the engine came near." Nor did she see the plaintiff make any attempt to stop them. There was nothing to prevent the plaintiff from seeing a quarter of a mile westerly up the track, or from seeing the engine, which was so close when Mrs. Gibson looked up that she saw at once that the accident was inevitable, if he did not "cross the track before the engine could catch him." If, therefore, we are to accept plaintiff's testimony alone, then it appears that for four hundred and fifty feet before reaching the crossing, he knew that the train was approaching, and that he did not turn his horses, which were trotting at a speed of only five or six miles an hour, aside to a place of safety, as he could easily have done. If we are, however, to take the testimony of his own witnesses, then, himself, a very deaf man, deliberately drove his team upon

the crossing without looking to see whether or not a train was approaching, at a slow pace, in broad daylight, when the track was visible to him for more than a quarter of a mile. That such conduct constitutes contributory negligence, as a matter of law, is settled beyond peradventure. (*Fleming v. Western Pacific R. R. Co.*, 49 Cal. 253; *Glascock* v. *Central Pacific R. R. Co.*, 73 Cal. 137; *Hager* v. *Southern Pacific Co.*, 98 Cal. 309; *Herbert* v. *Southern Pacific Co.*, 121 Cal. 227; *Green* v. *Southern Pacific Co.*, 132 Cal. 254.)

There is much testimony in the case to the effect that the bell was rung and the whistle blown; but putting that aside and assuming that such was not the fact, yet as the only purpose was to give warning, and as plaintiff, by his own testimony, knew of the approach of the train when he was four hundred and fifty feet from the crossing, the negligence of the defendant—if such there was—in failing to sound the bell or whistle, has no causal connection with the accident itself. (*Puckhaber* v. *Southern Pacific Co.*, 132 Cal. 363.) So, too, as to the failure of the engineer to stop the train. The fireman testifies that he first saw the plaintiff when the plaintiff was about one hundred and fifty feet and the engine about three times that distance from the crossing; that plaintiff was driving along at an ordinary rate of speed, about four miles an hour. The horses were trotting and did not show any signs of fright, and the fireman had no idea that plaintiff was going to try to cross the track until the plaintiff was about ten feet from the main track. As soon as he realized that plaintiff was endeavoring to cross the track the fireman called to the engineer, and every effort was made to avoid the collision.

Under this state of the evidence, there can, of course, be no effort to invoke the doctrine termed the "last-chance doctrine," to the effect that in cases of contributory negligence he who has the last clear opportunity to avoid inflicting an injury is responsible if without exercising ordinary care he fails to do so, for there was nothing in the approach of the plaintiff, according to the testimony of the fireman and of plaintiff's witnesses, to call for the stopping of the train. The fireman did not know that the plaintiff was deaf, and was not bound to assume that the driver of a team so approaching a crossing in broad daylight, with an unobstructed view—the

team merely trotting along—would not check his horses in a place of safety.

For these reasons the judgment appealed from is reversed.

Lorigan, J., and McFarland, J., concurred.

Hearing in Bank denied.