[Civ. No. 6573. First Appellate District, Division Two.—June 6, 1929.]

WILLIS ORION BARNETT, a Minor, et al., Respondents, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation) et al., Appellants.

SMITH CASNER, Respondent, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation) et al., Appellants.

LAVERNE HALLMARK, a Minor, et al., Respondents, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation) et al., Appellants.

HOLLACE TAYLOR, a Minor, Respondent, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation) et al., Appellants.

312

E. W. Camp, Robert Brennan, Platt Kent and Leo E. Sievert for Appellants.

Philip M. Carey, J. E. Rodgers, A. F. Bray, Sullivan & Sullivan and Theo. J. Roche and Mortimer B. Veale for Respondents.

NOURSE, J.—These four actions were consolidated by stipulation and tried together at the same time. The plaintiffs sued for damages resulting from a collision with an overland train operated by the defendant and an automobile driven by Raymond Hallmark near the town of Antioch. The verdicts were returned in favor of Lela Barnett and her infant child in the sum of $10,000; in favor of Smith Casner in the sum of $5,000; in favor of Zula Hallmark and her two minor children in the sum of $15,000, and in favor of Hollace Taylor in the sum of $6,000. The defendant has appealed from each of the judgments upon typewritten transcripts.

The accident occurred at about 6 o'clock A. M. on June 28, 1925, at a crossing over the main transcontinental line of the defendant corporation approaching the city of Antioch along the southern bank of the San Joaquin River. This crossing was along an unimproved extension of B Street through the private property of the Antioch Lumber Yard, which was used as an approach to an old wharf belonging to the company but abandoned some time prior to the accident. Five young men, Taylor, Casner, Barnett, Hallmark and Parks, had crossed over the railroad tracks and on to this wharf a short time prior to the accident riding in a Star touring automobile which was driven by Hallmark. Parks was seated on the driver's right in the front seat, Casner, Taylor and Barnett were seated in the rear seat. When they reached the wharf, Parks alighted and

secured a sack of minnows which he placed in the tonneau of the automobile and Hallmark thereupon backed the automobile off the wharf over the same course they had just followed. While they were thus approaching the railroad track Hallmark was looking to the left and rear of the automobile while the three men in the back seat had their heads down and were examining the minnows in the sack placed on the floor of the machine. At that time an overland train operated by the defendant corporation approached from the east, or to the right of the backing automobile. It was seen by Parks, who called to his companions to jump. He jumped free from the machine and was uninjured. Hallmark, Casner and Barnett were all killed as a result of the impact, while Taylor suffered serious injury.

The uncontradicted evidence was that the automobile was backing across the track at the rate of about five miles per hour; that the train was approaching at the rate of between twenty-five and thirty-five miles per hour; that the engineer had blown what is called the station whistle at a point some six or seven hundred feet from the crossing as he approached it; that the automatic bell on the engine was sounding continuously, and that when the engineer noticed the automobile backing toward the track he sounded four sharp warning whistles; that the automobile was then approximately fifteen feet from the north rail of the track; and that when the engine was approximately seventy-five feet from the crossing the engineer, seeing that the driver of the machine failed to stop, applied the emergency and air brakes and released sand upon the rails for the purpose of bringing the train to a stop.

The uncontradicted evidence is that all five of those riding in the automobile were familiar with the conditions surrounding the crossing; had passed over it at other times; that they knew the frequency of trains upon that track; and that they backed on to the crossing on this occasion without a single precaution for their safety. A small shed had been erected close to the wharf which obstructed the vision of those in the automobile so that until they reached a point about eighteen feet from the north rail of the track they were unable to see a train approaching from the east. Notwithstanding this fact, they did not stop, look or listen for approaching trains at any period of their journey from

the wharf to the railroad track. Hollace Taylor, the only member of the party who gave testimony on the subject, testified that from the point where they left the wharf to the point of collision they were backing approximately 100 feet; that they did not stop at any time until they reached the track; that there were no side curtains on the machine to obstruct their view; that he and his two companions on the back seat were examining the minnows during this whole time, and that until Parks called from the front seat to jump, he had not noticed the train approaching; that at that time the train was about 150 or 175 feet from the crossing. When this witness had fixed the train at that point one of his counsel volunteered the statement that he saw it before that, and after the court had taken a noon recess the witness was again called to the stand. This witness then testified that he first saw the train about 500 or 600 feet from the crossing. Another witness testified that he was standing at a point about forty-five feet from the point of collision; that he heard the whistle of the train some two miles away; that he saw the automobile on the wharf and saw it backing toward the railroad crossing as he saw and heard the train coming down the track. He called to the people in the automobile and noticed Parks, who sat in the front seat on the driver's right, turn and speak to the driver. The automobile was then about ten feet from the track. The automobile, however, continued to back toward the crossing and as the train approached it "whistled a lot of whistles." Numerous other witnesses testified to the continuous ringing of the bell, to the sounding of whistles and to the rumbling of the train which was heard for some three minutes prior to the collision. The engineer of the train testified that after he had sounded the long station whistle and when within 150 or 200 feet of the crossing he for the first time noticed the automobile backing toward the track; that he then sounded four sharp warning whistles, and when he saw that the driver of the machine failed to heed the warning, but continued on to the track, he applied all his brakes and released sand upon the tracks for the purpose of bringing the train to a stop. The train, however, did not stop until the engine had proceeded about 1,000 feet beyond the crossing and this is explained in the testimony of the engineer and others that, as the automobile was struck, oil and gas were

spilled upon the rails; that the wheels of the engines immediately locked and skidded, thus preventing the engineer to bring the train to a stop within a reasonable distance. At this point it is well to note that when the engineer was called as a witness for the plaintiffs under section 2055 of the Code of Civil Procedure, he was asked within what distance he could stop a train such as he was driving at the time. He answered within 120 feet. The plaintiffs rely strongly upon this testimony in support of their theory of the last clear chance doctrine, while the defendant quite properly suggests that it is not competent evidence as the engineer was not qualified as an expert and was not shown to have had any experience in trying to stop a train of the length such as he was driving at the time of the accident traveling at the speed testified to.

■ The undisputed evidence is that the five men in the automobile deliberately backed into a place of known danger utterly heedless of the warning bells and whistles and without the slightest effort to stop or to look or to listen for approaching trains. This evidence unmistakably demands a holding that they were all guilty of contributory negligence as a matter of law. It must be conceded that if they had stopped when they passed the corner of the shed, a distance of eighteen feet from the railroad track, and had looked, they would have seen the approaching train as from that point they had a clear vision of the track for a distance of approximately one-half a mile. It must also be conceded that if they had stopped at that point, or even closer to the track while still in a position of safety, they would have heard the whistle or bells or the rumble of the approaching train or the warning cries of the witness who stood near the point of collision. ■ The age-old doctrine that a railroad track is in itself a signal of danger and that anyone attempting to cross the track must stop, look and listen for approaching trains applies to the driver of a motor vehicle as well as to the driver of a horse-drawn vehicle or to a foot-passenger. The fact that the noise of a motor vehicle may often prevent the hearing of warning bells or whistles does not excuse the motorist from stopping if this is necessary to ascertain whether the track may be safely crossed.

This duty of the driver who attempts to cross a railroad track is well expressed by Mr. Justice Holmes in *Baltimore & Ohio R. R. Co.* v. *Goodman,* 275 U. S. 66, 69 [56 A. L. R. 645, 72 L. Ed. 167, 48 Sup. Ct. Rep. 24], where he says: "When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train, not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look. It seems to us that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk." The same principle is announced in *Young* v. *Southern Pac. Co.,* 189 Cal. 746, 754 [210 Pac. 259, 262], where the court says: "The law presumes that a person possessing normal faculties of sight and hearing must have seen and heard that which was within the range of his sight and hearing. Absent-mindedness or forgetfulness will not suffice as an excuse for the neglect of a person about to cross a railroad track to look and listen for a possible approaching train. And a person who attempts, regardless of warnings, to cross in front of a moving train, even though he be apparently in a condition of mental abstraction and consequently indifferent to the peril of his situation, is nevertheless negligent." The foregoing passage is quoted with approval in *Billig* v. *Southern Pac. Co.,* 192 Cal. 357, 363 [219 Pac. 992, 995], where many other authorities to the same purport are cited. In *Giannini* v. *Southern Pac. Co.,* 98 Cal. App. 126 [276 Pac. 618], evidence of contributory negligence far less convincing than what we have here was held to constitute contributory negligence as a matter of law within the rule of *Green* v. *Southern Cal. Ry. Co.,* 138 Cal. 1 [70 Pac. 926]; *Griffin* v. *San Pedro etc. R. R. Co.,* 170 Cal. 772 [L. R. A. 1916A, 842, 151 Pac. 282]; *Murray* v. *Southern Pac. Co.,* 177 Cal. 1 [169 Pac. 675]; *Billig* v. *Southern Pac. Co., supra,* and other cases cited.

Relying upon plaintiff's evidence the defendants moved for a nonsuit upon the ground, among others, of contributory negligence as a matter of law. The motion was denied. It should have been granted. The evidence there-

after received as a part of defendants' case and in rebuttal on the part of plaintiffs did not aid plaintiffs' case in any respect. If anything, it clearly emphasized the contributory negligence of these parties and the lack of negligence on the part of the defendants. The issue of contributory negligence should, therefore, have been taken from the jury by the trial judge upon an instruction that the evidence disclosed contributory negligence as a matter of law. Because the evidence on this issue was all one way the judgments must be reversed, but as the cases must be returned for a new trial we deem it proper to discuss one other point raised by the appellants, and that is the application of the doctrine of the last clear chance.

This issue was raised by the respondents upon the theory that even though the occupants of the car were guilty of contributory negligence as a matter of law, nevertheless the respondents were entitled to recover because the engineer could have, with the exercise of ordinary care, avoided the collision. The only evidence upon which this claim is based is the unsupported testimony of the engineer, when, in answer to a hypothetical question addressed to him by respondents, he said that he could stop the train within a distance of 120 feet. The question was objected to by the appellants upon the ground that it was incompetent and improper because it assumed facts not in evidence. The objection should have been sustained, but though the answer was permitted it does not form any basis for the claim that the appellants had a last clear chance to prevent the accident. There had been no attempt to prove that the engineer was an expert upon the facts concerning which he was interrogated and there was no attempt to incorporate in the question the facts and circumstances upon which the witness was asked to express an opinion. The opinion of a witness upon assumed facts differing from those shown by the evidence cannot be given any probative force (*Estate of Purcell,* 164 Cal. 300, 308 [128 Pac. 932]), and when such opinion is given in answer to a question which does not take the facts proved into consideration it is without value as evidence.

But assuming that the jury could have considered the conjecture of this witness as to within what distance he could stop a train of this character this wholly fails to

prove the issue of last clear chance. The undisputed evidence is that as the train left the trestle some 287 feet east of the collision the automobile was still backing toward the railroad track; that when the engine was about 150 feet from the point of collision the engineer sounded four sharp blasts of the whistle as a warning; that when the engine had reached a point about seventy-five feet east of the point of collision the engineer for the first time realized that those in the automobile had not heeded his warning signals and for the first time realized that they were in a place of danger. The evidence then is that at that time the engineer applied his brakes and did everything possible under the circumstances to avoid the injury. There is not a word of testimony which tends to prove, or from which any fair inference can be drawn, that from the time the engineer realized that those in the automobile were unable to escape from their place of danger he failed to do anything which ordinary care and prudence would dictate to avoid the injury. If we are to believe the corrected testimony of the witness Taylor that when the rear of the automobile was near the right-hand rail he looked up and saw the train approaching 650 feet distant, that the motor of the vehicle was still running, and that he did not jump because he assumed that the automobile had ample time to get out of the way of the train, it cannot be said that the engineer failed to exercise ordinary care in not applying his brakes at that point, because he too had the right to assume that the automobile would either cross safely over the track or that it would stop before reaching the point of danger. As said in *Basham* v. *Southern Pac. Co.*, 176 Cal. 320, 324 [158 Pac. 359, 360]: "When a person is approaching a place of danger, and all the warnings of the danger have been given that reasonable care requires, those in charge of the dangerous engine, seeing him thus acting, are not obliged to presume, and it cannot be said that they act unreasonably in not presuming, that the person will continue his approach until he gets into the very place of danger, when it is obvious that he could at any time, with the least care, stop and avoid it." (*Billig* v. *Southern Pac. Co.*, 192 Cal. 357, 363 [219 Pac. 992, 995].) It is in the testimony of this same witness Taylor that after the automobile stopped in the middle of the railroad tracks with its motor still running he saw its driver Hallmark switching

the clutch and that when the engine was still within 200 feet of the point of collision he still assumed that Hallmark would get the automobile out of danger. It is also in the evidence that at the speed at which the train was approaching those in the automobile would have had time to jump to safety when the automobile stalled upon the track. From the fact that they did not do so it is fair to assume that they still believed they had ample time to cross the tracks and escape from injury. To charge the engineer of the train with negligence in not having applied his brakes before that time would, therefore, be carrying the doctrine of last clear chance beyond the limits of the decisions. This view is well expressed in *Bagwill* v. *Pacific Elec. R. R. Co.*, 90 Cal. App. 114 [265 Pac. 507], and quoted with approval in *Giannini* v. *Southern Pac. Co., supra,* as follows: ''There seems still to be some misconception of this doctrine of last clear chance. It was not devised as a last resort to fasten liability on defendants. Like the body of the law of negligence, to which the doctrine is appended, the test remains as that of ordinary care under all of the circumstances. The law in many of its workings indicates great charity and solicitude for individual rights. It says to a negligent plaintiff that in spite of his lack of caution he will be protected against wanton, wilful or avoidable harm. But, on the other hand, it penalizes no innocent person. We are not to tear down the facts of a case and rebuild the same so that, by a trimming down and tight-fitting operation, something can be constructed upon which may fasten the claim of last clear chance. The words mean exactly as they indicate, namely, last *clear* chance, not possible chance. The Supreme Court has not left us to speculate on the application of the doctrine (*Palmer* v. *Ischudy,* 191 Cal. 696 [218 Pac. 36]; *Young* v. *Southern Pac. Co.,* 182 Cal. 369 [190 Pac. 36]; *Wallis* v. *Southern Pac. Co.,* 184 Cal. 662 [16 A. L. R. 117, 195 Pac. 408]; *Gainer* v. *United Railroads,* 58 Cal. App. 459 [208 Pac. 1013]).''

The facts in evidence in *Basham* v. *Southern Pac. Co., supra,* are almost identical with the situation in this case except that a horse-drawn vehicle rather than a motor vehicle was involved in the collision. We might paraphrase the language of that decision appearing on page 329 as follows: ''The bell of the engine was continuously ringing. The mov-

ing train itself must have made considerable noise. The automobile was proceeding at a slow speed under the control of Hallmark. He could have come to a standstill in a second. Under all these circumstances it would be extremely unreasonable for anyone to suppose he was unaware of the approaching train, and did not intend to stop before reaching the track, as he could easily have done, and as is the frequent custom. When the engineer began to entertain a fear that those in the automobile were inattentive he at once used every effort to stop the train. It cannot be said that either he did realize the danger sooner, or that in reason, with his knowledge, he had cause to realize it sooner. Hence the last clear chance doctrine never came into operation.''

Upon the reasoning in the Basham. case and upon the authority of *Wallis* v. *Southern Pac. Co., supra*, p. 673, we are satisfied that the trial judge erroneously instructed the jury that the doctrine of last clear chance applied in this case, in fact the evidence clearly demonstrates that the last clear chance to avoid the injury was with those whom the respondents represent and not with the appellants. The error in submitting this issue to the jury requires a reversal of the judgments notwithstanding any other errors claimed.

For the reasons given the judgments and each of them are reversed.

Koford, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 3, 1929, and a petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court, on August 5, 1929.

Curtis, J., and Langdon, J., dissented.