[Civ. No. 11921. First Dist., Div. Two. Sept. 28, 1942.]

KENNETH JOHNSON, a Minor, etc., Respondent, v. SACRAMENTO NORTHERN RAILWAY (a Corporation. et al., Appellants.

C. W. Dooling, Arthur B. Dunne and Dunne & Dunne for Appellants.

Elmer P. Delany, Joseph G. De Forest and George G. Olshausen for Respondent.

SPENCE, J.—In this action to recover damages for personal injuries sustained in a collision between plaintiff's motorcycle and an electric freight train operated by the defendant company, judgment upon the verdict of the jury was entered in favor of plaintiff and against the defendant railroad company and the defendant Torbet, the motorman. Defendants made a motion for judgment notwithstanding the verdict and also a motion for a new trial which motions were denied. Defendants appeal from the judgment and also from the order denying their motion for judgment notwithstanding the verdict.

The accident occurred at about 2 o'clock on the afternoon of September 24, 1938, on Highway No. 40, at a point near Vacaville where the single track of the defendant railroad company crosses said highway approximately at a right angle. Plaintiff, a young man 19 years of age was traveling from San Francisco to Salt Lake City upon his motorcycle and was proceeding along said highway in an easterly direction at a rapid speed. The motorcycle was a 1930 model and the front brake thereon was disconnected. The train of the defendant company consisted of an electric locomotive and a box car and it was proceeding in a southerly direction at a slow speed across said highway in making the trip from Vacaville to Fairfield. Plaintiff threw on his rear brake and

locked the rear wheel of his motorcycle at a point about 175 to 180 feet from the track. After skidding the motorcycle for about 100 feet, plaintiff threw it on its right side and thereafter the motorcycle and plaintiff slid from the remaining distance of approximately 75 feet to the track, striking the side of the locomotive. The motorcycle continued on through under the locomotive to the east side of tracks but plaintiff was brushed off beneath the train where one of the wheels of the rear truck of the locomotive ran over his arm. The train was promptly stopped and while one of plaintiff's legs was crushed, it was not run over.

Upon the trial, defendants made a motion for a nonsuit and a motion for a directed verdict. The trial court stated that there was a serious legal question as to whether the case should be permitted to go to the jury but the motions were denied. The trial court instructed the jury that plaintiff was chargeable with negligence as a matter of law but nevertheless submitted the case to the jury upon the theory that the last clear chance doctrine might be applied. The main question raised on this appeal is whether there was sufficient evidence to sustain the verdict and judgment or, stated in another way, whether there was any substantial evidence to warrant the giving of the instructions on the doctrine of last clear chance. Defendants contend that there was not and our review of the record and of the authorities cited by respective counsel leads us to the conclusion that defendants' contention must be sustained.

Before examining the evidence in greater detail, it is appropriate to refer to the essential elements which must be present to warrant a recovery, under the last clear chance doctrine, by one who has himself been guilty of negligence. Said doctrine may be said to be an exception to the general rule and its application is limited to those cases in which all of said elements are present. In the frequently cited case of *Palmer* v. *Tschudy*, 191 Cal. 696 [218 Pac. 36], the court said at page 700, "The last clear chance rule presupposes: that the plaintiff has been negligent; that as a result thereof she is in a situation of danger from which she cannot escape by the exercise of ordinary care; that the defendant is aware of her dangerous situation under such circumstances that he realizes, or ought to realize, her inability to escape therefrom; that he *then* has a *clear* chance to avoid injuring her by the exercise of ordinary care, and fails to do so. If all of these elements are present the rule applies and enables

the plaintiff to recover, notwithstanding her own negligence. But if any of them be absent the rule does not apply and the case is governed by the ordinary rules of negligence and contributory negligence.'' (Italics ours.) Substantially similar enumerations of said essential elements are found in many other cases. (See *Girdner* v. *Union Oil Co.*, 216 Cal. 197 [13 P. (2d) 915]; *Rogers* v. *Interstate Transit Co.*, 212 Cal. 36 [297 Pac. 884]; *Chappell* v. *San Diego etc. Ry. Co.*, 201 Cal. 560 [258 Pac. 73]; *Young* v. *Southern Pacific Co.*, 189 Cal. 746 [210 Pac. 259]; *Young* v. *Southern Pacific Co.*, 182 Cal. 369 [190 Pac. 36]; *Holmes* v. *South Pac. C. Ry. Co.*, 97 Cal. 161 [31 Pac. 834]; *Curtis* v. *Pacific Electric Ry. Co.*, 15 Cal. App. (2d) 580 [59 P. (2d) 890]; *Korchak* v. *Pacific Electric Ry. Co.*, 9 Cal. App. (2d) 89 [48 P. (2d) 752].)

The doctrine is most frequently applied in situations where a driver or pedestrian has placed himself, through his own negligence, in, or in very close proximity to, the path of an oncoming train or vehicle and is thereafter discovered in such position of danger by the operator of the oncoming train or vehicle in ample time for the latter to avoid the accident by the exercise of ordinary care. In such cases there is a distinct sequence of events which gives the party sought to be charged time for effective action to avoid the consequences of the injured party's original negligence or in other words a *last clear* chance to avoid the accident *after* the discovery of the injured party's peril. It is only in exceptional circumstances that the doctrine may be applied to cases involving collisions between two moving vehicles or at least in cases where the injured party is driving a rapidly moving vehicle for in such cases the act creating the peril ordinarily occurs practically simultaneously with the happening of the accident and the party sought to be charged can not be said to have had a *last clear* chance to avoid the accident *after* the discovery of the injured party's peril. That the injured party may not ordinarily invoke such doctrine in cases involving collisions between moving vehicles and trains at railroad crossings is established by numerous decisions in this jurisdiction. (*Young* v. *Southern Pacific Co.*, 189 Cal. 746 [210 Pac. 259]; *Read* v. *Pacific Electric Ry. Co.*, 185 Cal. 520 [197 Pac. 791]; *Wallis* v. *Southern Pacific Co.*, 184 Cal. 662 [195 Pac. 408, 15 A. L. R. 117]; *Young* v. *Southern Pacific Co.*, 182 Cal. 369 [190 Pac. 36]; *Basham* v. *Southern Pacific Co.*, 176 Cal. 320 [168 Pac. 359]; *Arnold* v. *San Francisco-Oakland Terminal Rys.*, 175 Cal. 1 [164

Pac. 798]; *Thompson* v. *Los Angeles etc. Ry. Co.*, 165 Cal. 748 [134 Pac. 709]; *Lambert* v. *Southern Pacific R. R. Co.*, 146 Cal. 231 [79 Pac. 873]; *Rasmussen* v. *Fresno Traction Co.*, 15 Cal. App. (2d) 356 [59 P. (2d) 617]; *Ellerman* v. *Pacific Electric Ry. Co.*, 7 Cal. App. (2d) 385 [47 P. (2d) 521]; *Barnett* v. *Atchison etc. Ry. Co.*, 99 Cal. App. 310 [278 Pac. 443]; *Giannini* v. *Southern Pacific Co.*, 98 Cal. App. 126 [276 Pac. 618].) In certain exceptional cases, cited by plaintiff, involving collisions between moving vehicles and trains, the last clear chance doctrine has been applied and we shall hereinafter refer to said cases.

We had occasion to deal at length with the question of the applicability of the last clear chance doctrine in *Poncino* v. *Reid-Murdock & Co.*, 136 Cal. App. 223 [28 P. (2d) 932], a case involving two moving automobiles at an intersection. In that case, we said at page 232, "While the doctrine of last clear chance has been applied in certain exceptional cases involving collisions between moving vehicles, we are of the opinion that it should not be applied to the ordinary case in which the act creating the peril occurs practically simultaneously with the happening of the accident and in which neither party can fairly be said to have had a *last clear chance* thereafter to avoid the consequences. To apply the doctrine to such cases would be equivalent to denying the existence of the general rule which makes contributory negligence a bar to recovery." (See, also, *Bagwill* v. *Pacific Electric Ry. Co.*, 90 Cal. App. 114 [265 Pac. 517]; *Giannini* v. *Southern Pacific Co.*, 98 Cal. App. 126 [276 Pac. 618]; *Barnett* v. *Atchison etc. Ry. Co.*, 99 Cal. App. 310 [278 Pac. 443]; *Baecht* v. *Marsh Bros. etc., Inc.*, 118 Cal. App. 63 [4 P. (2d) 585]; *Rasmussen* v. *Fresno Traction Co.*, 15 Cal. App. (2d) 356 [59 P. (2d) 617]; *Erwin* v. *Morris*, 10 Cal. App. (2d) 168 [51 P. (2d) 149]; *Lasch* v. *Edgar*, 46 Cal. App. (2d) 726 [116 P. (2d) 949]; *Behne* v. *Pacific Electric Ry. Co.*, 30 Cal. App. (2d) 437 [86 P. (2d) 843].)

In *Hutcheson* v. *Misenheimer*, 169 Va. 511, 194 S. E. 665, the court said at page 667, "The doctrine presupposes time for effective action. It is not applicable where the emergency is so sudden that there is no time in which to avoid the accident. Unless there is an appreciable difference in time between the earlier negligence of the plaintiff and the later negligence of the defendant and a last clear chance to avoid the accident afforded the defendant, which he fails to

avail himself of, the doctrine does not apply." (See, also, *Barnes* v. *Ashworth*, 154 Va. 218 [153 S. E. 711] ; *Juergens* v. *Front*, 111 W. Va. 670 [163 S. E. 618].)

And in *St. Louis S. W. R. Co.* v. *Simpson*, 286 U. S. 346, [52 S. Ct. 520, 76 L. Ed. 1152], the United States Supreme Court refused to apply the last clear chance doctrine where the evidence showed that the negligence of the deceased and of the conductor were "substantially concurrent." The court there said at page 1155, "The transaction from start to finish must have been a matter of seconds only. . . . Calculations so nice are unavailing to prove anything except the unity of the whole transaction. The several acts of negligence were too closely welded together in time as well as in quality to be viewed as independent."

It is also significant to note that the "situation of danger" or "position of danger," referred to in the authorities dealing with the last clear chance doctrine, is reached only when a plaintiff, moving toward the path of an oncoming train or vehicle, has reached a position "from which he cannot escape by the exercise of ordinary care." ▮ In other words, it is not enough, under the last clear chance doctrine, that plaintiff is merely approaching a position of danger, for until he has reached a position of danger, he has the same opportunity to avoid the accident by the exercise of ordinary care, as has the defendant. In such cases the ordinary rules of negligence and contributory negligence apply, rather than the exceptional doctrine of last clear chance. It is only in cases in which, after plaintiff reaches a position of danger, defendant has a last clear chance to avoid the accident by the exercise of ordinary care, and plaintiff has no similar chance, that the doctrine is applicable.

In *Young* v. *Southern Pacific Co.*, 182 Cal. 369 [190 Pac. 36], a case involving a collision between a motorcycle and a slowly moving train, the court said at page 380, "The only evidence observable by the train employees was that the deceased was proceeding heedlessly forward. The last clear chance doctrine was not applicable until he arrived at such a point as to be in peril, and this was the point where he could no longer escape injury by exercising ordinary care. Until he reached that point the train employees had a right to rely upon his continuing obligation to observe the approach of the train. . . . Under the last clear chance doctrine the peril which calls upon the train employees to act must be an actual

one, from which the imperiled party cannot escape by the exercise of ordinary care. Until the deceased reached the point from which he could not escape injury by the exercise of ordinary care, either by stopping or accelerating his pace, the doctrine of last clear chance does not apply.'' And in *Young* v. *Southern Pacific Co.*, 189 Cal. 746 [210 Pac. 259], the second appeal of the same case, the court said at page 757, ''. . . while the testimony last referred to may have shown that the deceased, when first sighted, was approaching a position of danger, still it does not show that at that time he was in a position of inescapable danger. And until he was in a position of inescapable danger the trainmen were not obligated to apply the emergency brakes. . . .''

In *Arnold* v. *San Francisco-Oakland Terminal Rys.*, 175 Cal. 1 [164 P. 798], a case involving a collision between an automobile and a street car, the court said at page 6, ''The doctrine of the last clear chance could not become applicable until Arnold's negligence had brought him so close to the track that he could not by ordinary care either stop or turn aside so as to avoid a collision, or until his conduct showed that he intended to hazard a crossing ahead of the car, and when these conditions became apparent the utmost care by either party would have been unavailing to prevent the accident.'' (See, also, *Taylor* v. *Pacific Electric Ry. Co.*, 172 Cal. 638 [158 Pac. 119]; *Green* v. *Los Angeles etc. Ry. Co.*, 143 Cal. 31 [76 Pac. 719, 101 Am. St. Rep. 68]; *Thompson* v. *Los Angeles etc. Ry. Co.*, 165 Cal. 748 [134 Pac. 709]; *Choquette* v. *Key System Transit Co.*, 118 Cal. App. 643 [5 P. (2d) 921].)

We now turn to a further consideration of the evidence in this case. The accident occurred on a clear, dry day on the broad main highway above mentioned. The highway at that point consists of the main concrete highway, twenty feet in width, with asphalt shoulders, each ten feet in width, at the sides thereof. The right of way for said highway is 100 feet in width, and dirt shoulders, which are practically level, are at either side of the asphalt shoulders. The highway is straight and practically level for a long distance in either direction. Near Vacaville, the single track line of the defendant company crosses said highway. There are numerous warning signs and signals in the vicinity of the crossing. A detailed description of these signs and signals need not be given, as plaintiff admittedly saw the signs, the track and the train when a long distance from the crossing. Suffice

it to say that as plaintiff approached the crossing from the west, he first crossed the intersection of the highway and Davis Street, where a large warning sign hung over the highway. This sign was 402 feet west of the crossing and plaintiff saw said sign and also saw the train as he was approaching said sign. The motorman likewise saw plaintiff as he was approaching said sign, and nothing thereafter obstructed the view of either.

It is not claimed that the train was operated at a rapid speed at any place in the vicinity of the crossing. It admittedly traveled slowly, the highest estimate of its speed at any place in the vicinity of the crossing being ten miles per hour. Other estimates were all lower. On the other hand, plaintiff's own estimate of his lowest speed before applying his brake was thirty-five to forty miles per hour. All other estimates of plaintiff's speed were higher and indicated that plaintiff was traveling at fifty-five to sixty miles per hour when he applied his brake. Plaintiff conceded that he was merely estimating his speed, as his motorcycle was not equipped with a speedometer. He had passed an automobile, which was traveling in the same direction, about one or two miles before reaching the crossing. The driver of said automobile was Mr. Hecker, an employee of the Motor Vehicle Department. Mr. Hecker testified that he himself was traveling at forty-eight or forty-nine miles per hour, as shown by his speedometer; that plaintiff was traveling in excess of fifty miles per hour upon passing; and that plaintiff thereafter pulled away so that plaintiff was about 1000 feet ahead of him at the time the accident occurred. One of the other disinterested witnesses, who was at the Davis Street intersection, estimated plaintiff's speed at sixty miles per hour.

The evidence regarding the skid marks and gouge marks stands uncontradicted. Plaintiff testified that when he applied the brake, the rear wheel locked and skidded. He also testified that he laid his motorcycle on its side "because that makes a motorcycle stop quick; the wheels are not turning and the whole side of the motorcycle is against the ground digging in and it drags down faster. . . ." When asked as to the most effective way to stop a motorcycle, plaintiff testified, "The most effective way is to throw it broadside and lay it on its side and let it dig in," which method would stop it "quicker than any brakes could." Testimony as to the length and nature of the marks was introduced through

several witnesses. The skid marks of the motorcycle started on plaintiff's right half of the concrete highway at a point 175 to 180 feet from the track. These skid marks were broken slightly, which breaking was no doubt caused by the bounding of the motorcycle after the application of brakes, as testified by numerous witnesses. These skid marks and gouge marks formed a slightly curved line, which crossed onto the asphalt shoulder on plaintiff's right side of the highway as they approached the track. The skid marks ended about seventy-five feet west of the track, and the gouge marks continued on from that point to the track. There is no serious dispute concerning the length of these marks or the fact that plaintiff's motorcycle made them, as plaintiff's counsel says in his brief, ''He applied the brake of the motorcycle with such force that burnt rubber marks were left on the concrete for the distance described by defendants' witnesses, and gouge marks on the south asphalt shoulder for seventy-five feet, according to the measurement of those marks by Highway Officer Olsen.''

There are other facts as to which there is no real conflict in the evidence. The point of impact with respect to the highway was near the center of the south asphalt shoulder or slightly south thereof. In other words, said point was at least fifteen feet south of the center of the concrete portion of the highway. Plaintiff interprets certain evidence as indicating that the point of impact may have been slightly further south and on the dirt shoulder rather than the asphalt shoulder, but we do not believe the evidence to which plaintiff refers, even if we assume that the point of impact may be inferred therefrom, strengthens plaintiff's position. After the impact, the train stopped after traveling not more than approximately eight feet. As to the point of impact with respect to the train, we likewise find no real conflict in the evidence. Defendants claim that the impact was on the side of the locomotive and to the rear of the front truck of the locomotive. Plaintiff claims in his briefs that there was evidence from which the jury could have inferred ''that the point of contact was in front of, or right at, the front truck of Motor 601.'' We find no evidence from which the jury could have inferred that the contact was at a point in front of the front truck or that plaintiff's arm may have been run over by the front truck rather than the rear truck, as suggested in plaintiff's briefs. The testimony of every

witness, including plaintiff, shows conclusively that plaintiff and the motorcycle slid into the side of and passed underneath the locomotive between the trucks, and that plaintiff's arm was run over by a wheel of the rear truck. Plaintiff had originally testified on his deposition with respect to the point of impact on the train and stated that he was pretty sure it was the box-car. On reading his deposition, he substituted the word "engine" for "box-car." Upon the trial, he testified that he went underneath the locomotive from the side; that he had run into the train rather than the train running into him; and that a wheel of the rear truck ran over his arm.

Plaintiff was questioned with respect to his ability to stop his motorcycle under the circumstances existing at the scene of the accident and he testified that going at a speed of thirty-five or forty miles per hour, he could have stopped the motorcycle, using only the rear brake, in around 140 feet or a little less.

Several witnesses, including disinterested witnesses, were at or near the scene at the time and testified as to the relative movements of the train and motorcycle shortly before the accident happened. The testimony of all of said witnesses, with the exception of plaintiff, was in substantial accord.

The testimony of said witnesses shows that the train had proceeded slowly down the track from its starting point in Vacaville, which was only a short distance away; that the train had slowed down almost to a stop as it approached the highway for the purpose of making a check of the operation of the signals and of the traffic on the highway; that one or more automobiles proceeding westerly had stopped in response to the signals and had then proceeded westerly across the tracks ahead of the approaching train; that the motorman saw plaintiff approaching from the west when plaintiff was beyond the overhanging sign at Davis Street and some 500 to 700 feet away from the track; that the motorman then glanced at an automobile which had been proceeding westerly and had stopped east of the tracks in response to the signal; that the motorman then slightly accelerated the speed of the train to cross the highway, which speed was never more than eight to ten miles per hour at the highest estimate; that after starting across the highway, the motorman again saw plaintiff, who was then 250 to 300

feet from the track; that plaintiff proceeded on toward the track and applied his brake when 175 to 180 feet from the track, resulting in the skidding and bouncing of the motorcycle; that the motorman immediately applied the brakes to stop the train, but that plaintiff and his motorcycle slid into the side of the train in the manner above described. While the testimony of the train crew was to the effect that it was difficult to estimate plaintiff's speed as he was approaching toward them, they estimated that just prior to applying his brakes, plaintiff appeared to be going about fifty-five miles per hour. As above indicated, other witnesses estimated the speed at that time at from fifty-five to sixty miles per hour.

Plaintiff's testimony differed from that of all other witnesses in certain particulars. He testified that he saw the train when he was near the overhanging sign and that the train was at a complete stop; that he approached the track at from thirty-five to forty miles per hour; that said complete stop had been made by the train, with the front of the locomotive about seven feet north of the northerly asphalt shoulder; that he was within 100 feet of the track when the train started up from said complete stop and that he thereafter threw on his brakes, locked his wheel, laid the motorcycle on its side and slid under the locomotive, as above described. It is upon this evidence that plaintiff relies, and he claims that said evidence was sufficient to support the verdict and judgment.

The inherent improbability of said testimony of plaintiff is at once apparent. Said testimony, insofar as it related to the speed of the motorcycle and the place where the brakes of the motorcycle was applied, was at variance with other evidence which was undisputed, including that concerning the skid and gouge marks made by the motorcycle when the brake was applied. (*Warwick* v. *Maneely,* 40 Cal. App. (2d) 235 [104 P. (2d) 831].) Said undisputed evidence showed that while plaintiff could have stopped his motorcycle under the circumstances within 140 feet by the application of the brake alone, if he had been traveling between thirty-five and forty miles per hour, he was traveling at such speed that he could not stop said motorcycle within 175 to 180 feet by the application of the brake and the further use of the more effective method of laying the motorcycle on its side and letting it ''dig in.'' But even disregarding for the moment

said undisputed testimony regarding the marks made by the motorcycle upon the highway, and considering only the testimony of plaintiff himself regarding the speed of the motorcycle and the place where the brakes were applied in relation to his testimony regarding the movement of the train, the inherent improbability of said testimony is still apparent. It would mean that the train, starting from a complete stop and proceeding at a slow speed, covered practically an equal distance in practically the same time in traveling from the point of the claimed complete stop to the point of impact as was covered by plaintiff after the application of his brake. It requires no further elaboration to show the inherent improbability of these portions of plaintiff's testimony.

But as we read plaintiff's briefs, he would apparently have us accept only portions of his testimony and only portions of the testimony offered by defendants, and then, by a process of elaborate calculation, applied to the selected portions of the testimony, determine that there was some evidence from which the jury could have reasonably concluded that the defendant motorman had a last clear chance to avoid the accident. We have endeavored to follow the calculations made upon the testimony so selected, but are unable, under any view of the evidence, to find any substantial evidence which would support a verdict and judgment based upon the last clear chance doctrine.

It must be remembered that the last clear chance doctrine involves just what its name implies. As this court said in *Poncino* v. *Reid-Murdock & Co.*, 136 Cal. App. 223 [28 P. (2d) 932], at page 227, "In other words, it is not enough to relieve a plaintiff of his own negligence that the defendant may have had a *chance* to avoid the accident, but the defendant must have had the *last chance* and also had a *clear chance* to do so by the exercise of *ordinary* care. That he should have had the *last chance*, implies that his chance to avoid the accident must have come later in point of time than any similar chance on the part of the injured person. That he should have had a *clear chance* implies that he must have had more than a *bare possible chance* to avoid an unexpected peril created practically simultaneously with the happening of the accident by the negligence of the injured party." (See, also, *Behne* v. *Pacific Electric Ry. Co.*, 30 Cal. App. (2d) 437 [86 P. (2d) 843]; *Bogardus* v. *Snyder*, 17 Cal. App. (2d) 411 [62 P. (2d) 153]; *Read* v. *Pacific Electric Co.*, 185 Cal. 520 [197 Pac. 791].)

It must be further remembered that considerable distance is covered by a rapidly moving vehicle in a very short space of time. Such distance may be calculated precisely, but it is sufficient for our purposes to say that an approximate calculation of travel in feet per second may be made by multiplying miles per hour by 1.5. Thus a vehicle going forty miles per hour travels approximately sixty feet per second and a vehicle going sixty miles per hour travels approximately ninety feet per second. ■ As above indicated, a rapidly moving vehicle approaching a railroad crossing does not reach a "position of danger," within the meaning of last clear chance doctrine, until it reaches a point where it can no longer be stopped or turned aside to avoid the collision. Up to that point, it is merely approaching a position of danger and the motorman need not assume in advance that the driver of the vehicle will pass from a position of safety without taking proper precautions. If the driver continues on without taking proper precautions, such as reducing his speed, it is clear that he will pass from a position of safety and into a position of danger in a fraction of a second. The last clear chance cannot come into operation until after the vehicle has reached such position of danger and ordinarily, in the case of rapidly moving vehicles, the remaining time is too short to afford to the motorman a *last clear chance* to avoid the accident. It is for this reason that said doctrine has ordinarily been held inapplicable to cases involving accidents between moving vehicles and trains at railroad crossings, and that it has been quite consistently held inapplicable in cases where the vehicles were moving as rapidly as was plaintiff's motorcycle. We have found no authority in which the doctrine has been applied where a rapidly moving vehicle has skidded into the side of a train. In such case, a recovery may be had, if at all, only under the ordinary rules relating to negligence and contributory negligence.

The comments last made sufficiently distinguish the authorities upon which plaintiff relies. *Chappell* v. *San Diego etc. Ry. Co.*, 201 Cal. 560 [258 Pac. 73], involved an automobile stalled on the track. *Starck* v. *Pacific Electric Ry. Co.*, 172 Cal. 277 [156 Pac. 51, L. R. A. 1916E, 58], involved a pedestrian standing between double tracks with her path blocked by a standing car. *Harrington* v. *Los Angeles Ry. Co.*, 140 Cal. 514 [74 Pac. 15, 98 Am. St. Rep. 85, 63 L. R. A. 238], involved what the court termed "peculiar circum-

stances." The deceased was engaged with a group of others in a bicycle race and spectators were lined along the sides of the road. Despite the warnings of spectators, the street car moved slowly across the path of the group of bicyclists. The court said on page 520: "There is no parallel between a case presenting such circumstances and the ordinary case where a person is discovered walking or riding towards a railroad track." *Nicolai* v. *Pacific Electric Ry. Co.*, 92 Cal. App. 100 [267 Pac. 758], is another case involving peculiar circumstances. The automobile there was proceeding in the opposite direction from the street car under such circumstances that it was trapped and could not be extricated from its position of danger. *Rasic* v. *Schultheiss*, 121 Cal. App. 560 [9 P. (2d) 550], involved a pedestrian struck by an automobile. *Paulos* v. *Market Street Ry. Co.*, 136 Cal. App. 163 [28 P. (2d) 94], involved a horse drawn vehicle which turned to cross a street car track and arrived at the track well ahead of the car. The court there said at page 169, that "Appellants do not deny that the evidence warranted instructions upon the doctrine of the last clear chance." None of said authorities presents facts which are similar to those presented by the record before us.

Here the negligence of plaintiff and the negligence, if any, of the motorman were, in the words of the United States Supreme Court "substantially concurrent" and calculations such as those made by plaintiff are "unavailing to prove anything except the unity of the whole transaction. The several acts of negligence were too closely welded together in time as well as in quality to be viewed as independent." (*St. Louis S. W. Ry. Co.* v. *Simpson*, 286 U. S. 346 [52 S. Ct. 520, 76 L. Ed. 1152].) And as was said in *Bagwill* v. *Pacific Electric Ry. Co.*, 90 Cal. App. 114 [265 Pac. 517], at page 121, "Certainly the doctrine of last clear chance never meant a splitting of seconds when emergencies arise. . . . We are not to tear down the facts of a case and rebuild the same so that, by a trimming down and tight-fitting operation, something can be constructed upon which may be fastened the claim of last clear chance. The words mean exactly as they indicate, namely last *clear* chance, not possible chance." There is no escape from the conclusion that the record before us presents a case where the "negligence of the injured party was contemporaneous, concurrent, continuing and contributory" with the negligence, if any, of the motorman and such a case

is excluded from the operation of the last clear chance doctrine. (*Young* v. *Southern Pacific Co.*, 189 Cal. 746 [210 Pac. 259].)

We therefore conclude that the case is governed by the general rules of negligence and contributory negligence, rather than by the last clear chance doctrine, as shown by authorities above cited dealing with ordinary collisions between moving vehicles and trains at railroad crossings. It follows that the evidence was insufficient to sustain the verdict and judgment and that defendants' motion for judgment notwithstanding the verdict should have been granted. In view of these conclusions, it becomes unnecessary to consider the other points raised in defendants' briefs.

The judgment and the order denying defendants' motion for judgment notwithstanding the verdict are reversed and the trial court is directed to enter its order granting said motion.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing was denied October 28, 1942, and respondent's petition for a hearing by the Supreme Court was denied November 27, 1942. Carter, J., voted for a hearing.