[Civ. No. 5448.   Fourth Dist.   June 24, 1957.]

JUDY ANN HALL, Appellant, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation) et al., Respondents.

*Assigned by Chairman of Judicial Council.

David S. Casey and Mahedy & Schall for Appellant.

Robert W. Walker, Richard K. Knowlton and Luce, Forward, Kunzel & Scripps for Respondents.

GRIFFIN, J.—Plaintiff and appellant brought this action against defendants and respondents to recover damages as a result of a collision between her car and defendants' freight train. The accident occurred about one-half hour after sunset on December 23, 1954. A single track of defendant company runs east and west, and about 45 feet north of the intersection of 28th Street and Harbor Drive, which drive also runs east and west. Twenty-eighth Street is approximately 42 feet wide, and runs north and south. A railroad switch standard was located 40 feet west of 28th Street near the track. Situated at distances of 5 feet east and west of this switch standard were imbedded railroad ties protecting the standard. Railroad crossing signs were in evidence. The point of actual impact was unknown, although plaintiff, who was traveling north on 28th Street, swerved to her left toward the center lane just prior to the impact. The train and the automobile came to a stop at the west post or about 65 feet from the center of 28th Street. A train of 15 freight cars, with the engine about 600 to 800 feet to the rear, was being pushed westerly around a slight curve up to the crossing at about 4 to 6 miles per hour. A street light standard was

located about 65 feet southwest of the crossing. Visibility was clear.

Plaintiff, an office worker at an industry located at the southwest corner of Harbor Drive and 28th Street, attended a Christmas party for a short period of time after leaving work that evening, procured her automobile from a parking lot on the southeast corner of Harbor Drive and 28th Street and stopped northbound on 28th Street at its intersection with Harbor Drive, at a red traffic signal. Upon change of the signal she proceeded northward, looked to her right for trains, and then observed defendant Hamlin, the switchman, in front of her waving a red fusee and lantern. Although she utilized this crossing every night and had frequently seen trains occupying it, plaintiff was unaware that defendant Hamlin was signaling for her to stop for a train. Swerving to her left she came to a stop on the tracks, remained there "maybe a couple of seconds," and then, becoming alerted as to a train's approach, she looked through her right front window or windshield and saw the train approaching. It was her opinion at that instant that it had not quite reached 28th Street. Plaintiff was unwilling to give an estimate of her distance from the track at the time she first saw the flare, but said she was traveling about 10 to 15 miles per hour. She testified in her deposition that she turned to her left when she was 20 feet from the track.

The evidence indicates, and she said she saw no lights on the approaching box car, heard no horn or bell of the train; and that she thought the switchman was signaling her to go around him until he shined a flashlight in her eyes; that someone hollered "train," so she stopped on the track and remained there a matter of "a couple of seconds" and "within the time it would take to look for one" she saw the freight car; that the switchman was standing just north of the track, waving the burning red fusee; that the freight car struck her car on its east side and carried it west down the track and pushed it into the switchstand, at which time she was thrown from the car and injured.

The testimony of the switchman, defendant Hamlin, is that he was standing on the track crossing carrying a lighted fusee and lantern; that he observed plaintiff approaching from a distance of between 20-35-40 feet; that at that time the freight car was about 50 to 70 feet from the crossing; that plaintiff was traveling 6 to 10 miles per hour and that she slowed down as if she was going to stop before reaching the track; that

instead she swerved to go around him; that when he saw she was going onto the tracks he gave the emergency stop signal to another switchman located on the top of the ninth car back, who relayed it to another switchman on top of the box car near the locomotive, who relayed it to the engineer seated in the engine; that he then ran northerly to avoid the collision, and at that instant the freight car was entering 28th Street; that immediately after the sound of the impact he heard the escaping of air from the application of the emergency air brakes. Some of these facts were corroborated by the other switchmen. The engineer testified he could not see the intersection from his position while rounding the curve but depended on the switchmen's signals and when he received the signal from the last one he applied the brakes; that he believed with this number of cars it would take two or three seconds to stop, and "it is as likely to stop within 60 feet as it would 40 or 80 feet"; that in his opinion the time required for the effective brake operation through this cut of 15 cars, would be two or three seconds. Other "outside" witnesses testified they observed that the leading box car was at the edge of or about 15 feet from 28th Street at a time when plaintiff's vehicle was at a similar distance from the tracks, and also said plaintiff's car did not stop before the impact. Based upon certain isolated facts and disregarding others, plaintiff has made calculations which she claims indicates that she was entitled to her proffered instruction on the last clear chance doctrine, which the court refused to give. Her claim is that this evidence shows that when plaintiff was approximately 20 feet from the track, moving at 10 to 15 miles per hour, the nearest freight car was then about 60 to 70 feet away, moving at four to six miles per hour; that mathematically, plaintiff was traveling 15 to 20 feet per second at a point about 20 feet from the point of collision and the train was moving approximately six to nine feet per second at a point 60 to 70 feet from the point of collision; that accordingly, the jury could find that the train could have been stopped within 40 to 60 feet; that since the brakes on the train were not applied until after the first impact and the train carried plaintiff, unharmed, for 85 feet thereafter before it crashed her car against the switchstand and injured her, the trainman was able to stop well within that distance, and could have avoided her injury. She relies principally upon *Daniels* v. *City & County of San Francisco,* 40 Cal.2d 614 [255 P.2d 785]; *Sills* v. *Los Angeles Transit Lines,* 40 Cal.2d

84

630 [255 P.2d 795] ; and *Brooks* v. *E. J. Willig Truck Transp. Co.*, 40 Cal.2d 669, 678 [255 P.2d 802].

We are in accord with the trial court's ruling in reference to the proffered instruction and in denying a new trial based on this ground. (*Chambers* v. *Southern Pac. Co.*, 148 Cal.App.2d 873 [307 P.2d 662].) The Brooks decision was predicated upon the theory that it was known by the driver of a truck that Brooks was in a perilous and helpless position, after the initial collision, and defendant, after carrying him unharmed for some distance, had a last clear chance to have stopped the truck in time to prevent the wheels from later running over him. We do not believe the calculations made by plaintiff furnish substantial evidence for the operation of the last clear chance doctrine. Here we are dealing with a long train of freight cars operating on its own track, which is properly posted and with a switchman signaling with a red flare fusee indicating the presence of the approaching train, being pushed by an engine operated and controlled by an engineer 600 to 800 feet from the scene of the collision and being guided by means of signals communicated to him from three different switchmen. After plaintiff disregarded the fusee signal and notice by voice that a train was approaching, she nevertheless left a place of safety and went upon the tracks somewhere near the center of 28th Street. When her perilous condition was noticed by the switchman, timely notice was communicated, through the other switchmen, that an emergency stop was necessary. The engineer had no way of realizing plaintiff's perilous condition at any time. The natural reflex time in communicating the emergency stop and the time for effective brake operation must be considered, together with the speed and ability to stop such a train in a given distance. (*Choquette* v. *Key System Transit Co.*, 118 Cal.App. 643 [5 P.2d 921] ; *Poncino* v. *Reid-Murdock & Co.*, 136 Cal.App. 223 [28 P.2d 932] ; *Berton* v. *Cochran*, 81 Cal. App.2d 776 [185 P.2d 349].) This is not a case where the engineer saw the predicament in which plaintiff had by her own negligence placed herself and seeing such predicament failed to stop after having a last clear chance to do so, as held in the Brooks case. It was said in *Rodabaugh* v. *Tekus*, 39 Cal.2d 290, 296 [246 P.2d 663] :

" ' . . . it is not enough to relieve a plaintiff of his own negligence that the defendant may have had *a chance* to avoid the accident, but defendant must have had the *last chance* and also had a *clear chance* to do so by the exercise of *ordinary*

care.' '' And at page 295, that " 'Calculations so nice are unavailing to prove anything except the unity of the whole transaction. The several acts of negligence were too closely welded together in time as well as in quality to be viewed as independent.' ''

See also *Berton* v. *Cochran,* 81 Cal.App.2d 776 [185 P.2d 349] ; *Dalley* v. *Williams,* 73 Cal.App.2d 427 [166 P.2d 595] ; *Schouten* v. *Crawford,* 118 Cal.App.2d 59 [257 P.2d 88] ; *Story* v. *Cox,* 130 Cal.App.2d 231 [278 P.2d 720] ; *Wilson* v. *Knudsen Creamery Co.,* 137 Cal.App.2d 552 [290 P.2d 677] ; and *Hazlett* v. *Miller,* 115 Cal.App.2d 801 [252 P.2d 997].)

In *Johnson* v. *Sacramento Northern Ry.,* 54 Cal.App.2d 528, 542 [129 P.2d 503], [hearing denied in the Supreme Court] in reference to a railway accident, the court said:

" 'Certainly the doctrine of last clear chance never meant a splitting of seconds when emergencies arise. . . . We are not to tear down the facts of a case and rebuild the same so that, by a trimming down and tight-fitting operation, something can be constructed upon which may be fastened the claim of last clear chance.' '' And further held that the doctrine of last clear chance is not applicable where the negligence of the injured person is contemporaneous and concurrent with the negligence, if any, of defendant.

█ The rule is that there must be substantial evidence to show defendant had a last clear chance to avoid the accident. (*Hazelett* v. *Miller,* 115 Cal.App.2d 801 [252 P.2d 997] ; *Fleharty* v. *Boltzen,* 137 Cal.App.2d 187 [290 P.2d 311] ; *Dalley* v. *Williams, supra.*) To the same effect is also the case of *Brandelius* v. *City & County of San Francisco,* 47 Cal. 2d 729 [306 P.2d 432], holding that before the last clear chance doctrine may be applied the necessary elements, as there indicated, must be supported by substantial evidence. Time is such an element and an all-important factor.

█ The time for defendant's exercise of any last clear chance commences only at such time as he has both actual knowledge of the injured person's "position of danger" and actual or constructive knowledge that such person "cannot escape from such situation." It affirmatively appears to us that in considering the evidence as a whole, there was no substantial evidence that all of these elements had been affirmatively established.

█ In addition, the instruction offered and refused was in the language of BAJI Number 205, criticized in *Moreno* v. *Los*

*Angeles Transit Lines,** (Cal.App.) 286 P.2d 923, later dismissed; and *Brandelius* v. *City & County of San Francisco,* (Cal.App.) 296 P.2d 415 [hearing granted]. The Brandelius case, decided by the Supreme Court, *supra,* in effect held that this instruction which was there given was erroneous and the trial court might properly grant a new trial on this ground if it believed that the instruction could have misled or confused the jury. (See also *Lamoreux* v. *San Diego & Arizona Eastern Ry. Co.,* 48 Cal.2d 617, 621 [311 P.2d 1].)

▮ The final argument is that the court erred in giving an instruction requested by defendants, to the effect that the jury should apply the same tests to testimony given by employees of the railroad company as it would to any other witness in the case. Complaint is made that the instruction, in effect, told the jury it was not to consider any prejudice these witnesses might have in favor of the railroad company even though they were interested witnesses, citing *Murray* v. *Llewellyn Iron Works Co.,* 4 Cal.App. 41 [87 P. 202]; and *Gray* v. *Southern Pac. Co.,* 23 Cal.2d 632 [145 P.2d 561].

It was held in the Murray case that a somewhat similar instruction, if given, would be erroneous. However, here there was testimony of other witnesses, not employees, testifying for defendants. Plaintiff relied upon much of the testimony of defendants' employees in her endeavor to establish defendants' negligence and to bring the case within the last clear chance rule. This instruction was followed by the general instruction that the jury was the sole judge of the credibility of all witnesses; that the witnesses were presumed to speak the truth and such presumption may be overcome by contradictory evidence, by the manner in which the witnesses testified, or by evidence that pertains to their motives. The challenged instruction does not, in any manner, set up tests of credibility with respect to an employee witness, but merely instructs the jury that they shall judge such witnesses by the same tests as set out in the instruction relating to the credibility of witnesses in general. In *People* v. *Washburn,* 54 Cal.App. 124 [201 P. 335], the trial court refused a somewhat similar instruction. The court, on appeal, held it might well have been given. It recites, at page 127:

" 'This defendant, under the laws of California, has a right to take the witness-stand in his own behalf. It is your

---

*A hearing was granted by the Supreme Court on October 5, 1955. On April 4, 1956, the appeal was dismissed pursuant to stipulation.

duty to carefully weigh and consider his testimony as you would the testimony of any other witness. You should not reject and disregard his testimony merely because he is the defendant in this case, but you should apply to his testimony the same rules in determining the credence to which the same is entitled that you would apply to any other witness in the case.' ''

Although it was held in the Murray case that the refusal to give an instruction in a somewhat similar case was proper, it does not appear to us that prejudicial error resulted. (*People v. Watson*, 46 Cal.2d 818 [299 P.2d 243].)

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied July 22, 1957, and appellant's petition for a hearing by the Supreme Court was denied August 20, 1957. Carter, J., was of the opinion that the petition should be granted.