[Civ. No. 5760. Fourth Dist. Dec. 15, 1958.]

GILBERT DEAN MILLER et al., Respondents, v. ATCHI-SON, TOPEKA & SANTA FE RAILWAY COMPANY (a Corporation), Appellant.

Robert W. Walker, Matthew H. Witteman and Knauf, Henry & Farrell for Appellant.

Alexander K. Ginsburg for Respondents.

GRIFFIN, P. J.—This action involves a railroad crossing collision between an automobile owned and operated by plaintiff Gilbert Dean Miller, and occupied by the other plaintiffs, and a freight train at the Santa Fe crossing of Sierra Way, in a residential section of San Bernardino. It occurred on Friday evening, April 29, 1955, about 10 p. m. The weather was clear, cold and dry and the night dark. The intersection is formed by a right-angle crossing of defendant's single track railroad with Sierra Way, which runs in a general north-south direction. The railroad track runs east and west on a right of way paralleling the south side of 30th Street. Sierra Way has an asphalt surface approximately 82 feet wide at the crossing. Northbound, the level of the street rises, like a gradual ramp, as it approaches the rails. The rise commences about 81 feet south of the tracks and reaches an apex upon the crossing itself. A large drainage channel runs underneath the tracks and right of way along the east side of Sierra Way. Trees line the parkway on either side of the street south of the tracks, as do sidewalks and curbs. A residence, to a great extent, obscures the vision of a northbound automobile on Sierra Way approaching a westbound train. The same condition prevails in reference to the vision of a westbound train in reference to northbound traffic on that street. The track on either side of Sierra Way was flanked by the crossbuck type of railroad crossing signs. The crossing sign confronting northbound traffic was reflectorized. There was no automatic signaling device at this intersection although there was one on Arrowhead Avenue directly west of it. Photographs in evidence depict a railroad warning sign painted upon the pavement and another, (vertical warning sign) planted in the east parkway, within a block south of the tracks. Over the crossing itself were suspended two street lights, illuminated on the evening of the accident. The Santa Fe operated the track six days a week, generally during the evening hours, without schedule, with a freight train servicing industries on the Redlands loop.

Plaintiff Gilbert Miller was driving himself and his youthful companions, the other three plaintiffs, represented by their guardian ad litem, James A. Miller, up Sierra Way to

a drive-in in a 1952 Plymouth sedan at a speed estimated between 20 and 35 miles per hour. All of them, with the possible exception of Joyce Lasky, admitted familiarity with the railroad crossing. Gilbert Miller was 20 years old at the time. Seated to his right was plaintiff Beverly Peterson, 16 years of age. In the back seat, directly behind the driver, sat plaintiff Joyce Lasky, a high school student in her junior year, and plaintiff Edwin Kiefer, 21 years of age at the time of trial.

At the trial, Gilbert Miller, injured seriously in the accident, testified generally that he recalled nothing as to its happening. However, he did testify that he had had a complete overhaul of his car brakes two weeks before the accident; that in the year preceding the accident he had been over this crossing many times, both day and night, and had never seen a train cross this intersection on the track; that he was familiar with the crossing and knew there was a 35-mile per hour sign posted on Sierra Way about three blocks south of the tracks.

The medical testimony was that he suffered severe brain concussion, fractured skull, right facial paralysis (Bell's Palsy), resulting in severe headaches, cutting of a nerve over one eye and nervousness. Special damages to date of hearing indicated about $2,300. There was some evidence of permanent lag in the right eyelid, due to residual effect of facial paralysis. The jury awarded him $5,000.

Plaintiff Kiefer testified that the four of them were riding north on Sierra Way; that he knew the railroad crossing was there; that this evening, when Miller's car was 70 to 80 feet south of the tracks, he saw the headlights of the train and the black and white stripes on the approaching engine when it was about 200 to 250 feet east of Sierra Way; that the moment he saw it he yelled "train," and immediately thereafter he heard Miller say "train"; that he felt the application of the brakes on the car and braced himself; that the train did not slow down and he estimated its speed at 27 to 33 miles per hour; that the right front fender of Miller's car struck the left front portion of the engine and he was thrown out and injured; that he saw two suspended street lights overhead but did not remember seeing the railroad crossing sign from down the street that night, although he knew they were approaching a railroad crossing; that he heard no whistle or bell of the train until after the crash;

and that Miller's car was traveling about 5 or 6 miles per hour or was stopped at the time of the collision.

His injuries showed a comminuted displaced fracture of the leg (femur); that it took six weeks to heal after major surgery, and resulted in a ⅜ inch shortening of his leg, which was believed to be permanent. Special damages, including medical and hospital expenditures, amounted to about $3,400. He was awarded only $3,500 damages.

Plaintiff Beverly Peterson testified she recognized this area and had been across the tracks at this intersection on many occasions; that this night she did not hear a train whistle or bell; that she heard someone yell "train," looked and saw something big coming at her; that she didn't know what it was and didn't remember anything else after the collision. Her injuries amounted to upper and lower lips being cut and the loosening of upper teeth in front. Some of the upper ones were broken. Bones of the upper jaw were removed and her face sutured. She had concussion of the brain, lacerations and bruises, and suffered much pain. X-ray pictures were taken which showed probable fractures of mandible and dislocation of the jaw. She appeared to be mentally sluggish compared to her prior mentality. Some permanent disability of the mouth is indicated, and the scars will be permanent. Further neurological type of treatment was recommended, and probable loss of some of the loosened teeth will follow. Her special damages were about $3,100. The jury awarded her $5,000.

Plaintiff Joyce Lasky testified that the car slowed down and collided with the engine but she did not realize what had happened; that the first thing that attracted her was Miller's remark "train," but she did see the engine down the tracks about 150 to 200 feet from the crossing. Her injuries were not as serious as the others. She testified she suffered general shock, her right leg was injured and was swollen to one-half again its normal size; that the swelling remained for about one week but there was still a lump on the lower portion of it and it caused her to limp for some time; that her forehead had a bump on it which the doctor described as concussion. She was away from her employment for about one week, lost $12 by reason of it, lost a sweater, and contracted hospital and doctor bills in excess of $55. Damages awarded to her amounted to $350.

Defendant, in its brief, concedes that even though the verdicts exceeded the special damages incurred as to each plain-

tiff, they did appear low in relation to the undisputed evidence of injuries received in reference to plaintiffs Kiefer, Peterson and Miller. The trial court found them to be inadequate, and we conclude that this finding is sufficiently supported.

In passing on a motion for new trial on the ground that the damages awarded are inadequate, the trial judge is entitled to reweigh the evidence and exercise his independent judgment thereon, and if he concludes that the damages proved are not adequate compensation he may grant a new trial on that ground. (*McNear* v. *Pacific Greyhound Lines,* 63 Cal.App.2d 11, 17 [146 P.2d 34] ; *Uhl* v. *Baldwin,* 145 Cal.App.2d 547, 554 [302 P.2d 841].) No abuse of discretion appears in granting a new trial on this ground. The principal contention of the defendant on this appeal is that the court should have granted a new trial on all issues and that the judgment should be reversed, particularly since the evidence of defendant's negligence and the evidence of contributory negligence affecting defendant's liability was close and that it affirmatively appears therefrom and from the size of the verdicts rendered that a compromise verdict resulted. It is further argued that it was prejudicial error for the trial court to grant a new trial limited to the issue of damages when it affirmatively appears that the trial court erred in giving an instruction on the doctrine of last clear chance, where there is no substantial evidence to support the theory; and in informing the jury that, as a matter of law, the guest passengers were not guilty of contributory negligence and in refusing to instruct the jury, as requested by defendant, on this doctrine. As to these questions we will give a further résumé of the evidence which might affect them.

Engineer Ward, seated in the cab of the engine on the north side, testified generally as to his familiarity with this crossing and the route in general. He said his train of 21 freight cars, including the caboose, was approaching this intersection from the east at about 25 to 28 miles per hour and that this statement was corroborated by a special tape recording device on the locomotive; that he was traveling below the speed limit of 30 miles per hour established by the company for this district; that at a whistle post, 1,400 feet from the intersection, he sounded the whistle— two long— one short—two long, and set the automatic bell, which continued to ring until after the accident; that he thereafter blew the whistle on several occasions before reaching this

crossing; that the headlight on the engine was bright and was shining down the track which illuminated it for a distance of about 800 feet; that about 100 to 200 feet from the east curb of Sierra Way he was traveling about 20 miles per hour when fireman Murphy, seated in the south window of the cab, told him of a car approaching the crossing on Sierra Way; that he again blew the whistle and then Murphy said: "I don't think they are going to stop—better—'big blast' or 'hole it' (both terms mean to put brakes in emergency); and that he did so immediately and threw on the sander; that at this time the engine was about 100 to 120 feet from said curb and that only seven or eight seconds elapsed between then and the accident; that with all brakes applied the train did not come to a stop until the engine was about 450 to 500 feet west of the intersection; and that the tenth freight car was then standing across the highway.

Murphy testified that the bell was constantly ringing from a point about four blocks east of the intersection; that the whistle first blew 700 to 800 feet east of the intersection and the train was traveling about 20 to 25 miles per hour; that when the engine reached a point about 200 feet east of the intersection he noticed the lights on a car which was south of the intersection traveling north at about 35 to 40 miles per hour; that he expected it to stop and there was no indication it was not going to stop. (There is some possible variance between this last statement and a statement made by him in his deposition. He there said the first time he saw the approaching automobile it looked like "a pretty direct meet" but that the "closer we got, it was inevitable to me we were going to hit," and he said "plug it" and that he "formed the impression they were not aware of the train"). He then testified that he remarked to the engineer that a car was approaching the intersection; that when the engine was about 50 to 75 feet from the intersection the car he saw was then about 100 to 200 feet from the crossing going about 35 miles per hour and he then told the engineer to "plug it" and the full emergency brake was immediately applied; that the automobile struck the front portion of the engine resulting in the accident described.

A brakeman, Hendricks, seated in the cab near the south window, corroborated this testimony and said when he first saw the car it was then 175 to 200 feet south of the intersection and the engineer was then told to "big hole" her and he immediately applied the emergency brakes and that

the engine was then about 75 feet and the car about 100 feet from the intersection.

It appears that this intersection and the one west of it (Arrowhead) where electric signals had been installed, were comparatively well traveled intersections and a considerable number of other cars were or had been traversing this intersection that night. Plaintiffs produced other witnesses living in the neighborhood who testified they heard no bell or whistle from the train until about the time of the collision. Defendant produced others who heard both the bell and whistle for a long time prior to and immediately before the accident.

In respect to the last clear chance instruction it has been definitely held in the late case of *Brandelius* v. *City & County of San Francisco*, 47 Cal.2d 729, 743 [306 P.2d 432], that: "The doctrine of last clear chance may be invoked if, and only if, the trier of facts finds from the evidence: (1) that the plaintiff was in a position of danger and, by his own negligence, became unable to escape from such position by the use of ordinary care, either because it became physically impossible for him to escape or because he was totally unaware of the danger; (2) that defendant knew that plaintiff was in a position of danger and further knew, or in the exercise of ordinary care should have known, that plaintiff was unable to escape therefrom; and (3) that thereafter defendant had the last clear chance to avoid the accident by the exercise of ordinary care but failed to exercise such last clear chance, and the accident occurred as a proximate result of such failure." The Supreme Court there emphasized the necessary interval that must exist between the time defendant is chargeable with actual knowledge of the position of danger and with actual or constructive knowledge of the plaintiffs' inability to escape. It said, at page 741:

"It seems entirely clear that the time when defendant is chargeable with actual knowledge of the injured person's position of danger may substantially precede the time when defendant is chargeable with actual or constructive knowledge of the injured person's inability to escape therefrom; but defendant is not liable under the doctrine unless *after the time that he is chargeable with the required knowledge of the injured person's inability to escape,* he 'has the last clear chance to avoid the accident by exercising ordinary care.'" (Italics ours.)

As pointed out in *Doran* v. *City & County of San Francisco*, 44 Cal.2d 477 [283 P.2d 1], the time element is an all-im-

portant factor. There must be substantial evidence to show defendant had a last clear chance to avoid the accident, by the use of reasonable care, *after the time the injured party had lost any similar opportunity to avoid the accident by the use of such care.*

If we consider the evidence in the instant case in a light most favorable to plaintiffs, it does not indicate that from the time of defendant's actual knowledge of plaintiffs' position of danger and defendant's further knowledge, actual or constructive, of plaintiffs' inability to escape therefrom, defendant actually had a *last clear chance* to avoid the accident by the exercise of ordinary care. That he should have had a *clear chance* implies that he must have had more than a *barely possible chance* to avoid an unexpected peril created practically simultaneously with the happening of the accident by the negligence of the injured party. (*Rodabaugh* v. *Tekus,* 39 Cal.2d 290, 296 [246 P.2d 663]; *Poncino* v. *Reid-Murdock & Co.,* 136 Cal.App. 223, 227 [28 P.2d 932].)

The court did instruct the jury that "when a person driving an automobile approaches a railroad track he is presumed to know that he goes to a place where he may be injured or killed. It is always train time at any railroad crossing, and he must approach the crossing with the assumption that the crossing is not clear. He is presumed to know that he must stop for the train and not the train stop for him. The train has the right of way. If he relies upon not seeing and hearing the train or any signal and takes no further precautions he does so at his own risk. If at the last moment he finds himself in an emergency caused by his own failure to look and listen, and stop, if necessary, it is his own fault and not the fault of the railroad . . ."; that "It is the rule in respect of the right of way at a railroad crossing that a vehicle or person approaching a steam railroad crossing, with the intention of going over the tracks, is under the duty to yield the right of way at that crossing to any railroad train which may be approaching the crossing . . ."; and that "the engineer and fireman of the train in approaching this crossing, . . . had a right to assume and to act upon the assumption that a person approaching the crossing would perform the duty that the law imposes upon him to look and listen, and in the reasonable exercise of his faculties of observation and caution, will not attempt to go over such crossing until the danger due to the approaching train has passed and there is no duty to check the otherwise rightful speed of the train in approaching and

passing such crossing until at least there is reason to believe that such person approaching such crossing is not performing or is not likely to perform his duty to look and listen, and if necessary to stop before attempting to cross the tracks.''

Considering the entire evidence and the law thus applicable, we are convinced there was no sufficient substantial evidence of the necessary elements which would justify the giving of such an instruction. (*Chambers* v. *Southern Pac. Co.*, 148 Cal.App.2d 873 [307 P.2d 662]; *Provost* v. *Worrall*, 142 Cal. App.2d 367, 377 [298 P.2d 726]; *Durkee* v. *Atchison T. & S. F. Ry. Co.*, 159 Cal.App.2d 615 [324 P.2d 91]; *Hall* v. *Atchison T. & S. F. Ry. Co.*, 152 Cal.App.2d 80 [312 P.2d 739].)

In *Galbraith* v. *Thompson*, 108 Cal.App.2d 617, 622 [239 P.2d 468], the court held that charging the jury upon the doctrine of last clear chance when there is no substantial evidence to support the theory is reversible error. (See also *Hickambottom* v. *Cooper Transportation Co.*, 163 Cal.App.2d 489 [329 P.2d 609].)

Plaintiffs cite *Connolly* v. *Pre-Mixed Concrete Co.*, 49 Cal.2d 483 [319 P.2d 343]; and *Durkee* v. *Atchison T. & S. F. Ry. Co.*, 159 Cal.App.2d 615 [324 P.2d 91], as authority in support of the court's action in giving such an instruction. Suffice it to say the cases relied upon are factually dissimilar. The rule of law is practically the same. It should be here noted that the Supreme Court in *Brandelius* v. *City & County of San Francisco, supra*, criticized the language of BAJI Instruction No. 205, as here given, in reference to the terms ''position of danger'' and ''perilous situation'' as being misleading and confusing. Plaintiffs claim that the Supreme Court, by inference, approved such an instruction in the Connolly case, and further contend that even if it was erroneous it was not prejudicial. The form of the instruction given in the Connolly case is not set forth in the opinion. If it was the same as the instruction here involved no mention was made of the infirmity pointed out in the Brandelius case. It is possible that this question was not there raised or considered, or that the instruction given was not worded in the same language.

It might well appear that the giving of this instruction in the language of BAJI Number 205 was erroneous and that the jury may have been confused or misled by the words employed. It should be further noted that the instruction as given was general as to all plaintiffs, and its application was not limited to plaintiff driver.

■ As to the sufficiency of the evidence permitting the question of the plaintiff guests' contributory negligence to be submitted to the jury, another close question arises. ■ It is a general rule that the law does not demand of a passenger the same high degree of observation as it requires of the driver, for the passenger has not, in the ordinary case, any actual control over the driver. He is normally bound to protest against actual negligence or recklessness of the driver, but the extent of his duty depends upon the particular circumstances of each case and is ordinarily a question of fact for the jury. (*Wagner* v. *Atchison T. & S. F. Ry. Co.*, 210 Cal. 526, 528 [292 P. 645].) See also *Lugo* v. *Atchison T. & S. F. Ry. Co.*, 128 Cal.App.2d 402, 406 [275 P.2d 605]; and *Tice* v. *Pacific Electric Ry. Co.*, 36 Cal.App.2d 66, 70 [96 P.2d 1022, 97 P.2d 844].)

In *Howard* v. *Alta Chevrolet Co.*, 111 Cal.App.2d 38, 44 [243 P.2d 804], the court said (quoting from *Parker* v. *Southern Pac. Co.*, 204 Cal. 609 [269 P. 622]):

" 'On the record before us it cannot be said that the jury might not find that the plaintiff was in some degree at fault in not apprising the driver of the impending danger.' " And, at pages 43 and 44, that:

"Even where the negligence of the driver of a vehicle is not to be imputed to a passenger it has been frequently held that the passenger is bound to exercise ordinary care for his own safety; that he may not shut his eyes to an obvious danger, he may not blindly rely on the driver in approaching a place of danger, and whether or not he has exercised ordinary care under the circumstances is usually a question of fact for the jury and not of law." (Citing cases.)

In *Martindale* v. *Atchison T. & S. F. Ry. Co.*, 89 Cal.App.2d 400, 408 [201 P.2d 48], a debatable question arose under a somewhat similar set of facts. There the guests were killed and the heirs brought an action for damages for their death. There was no direct evidence of their conduct and the decision of the jury rested on inferences drawn from conditions found after the collision. The Supreme Court held there were sufficient inferences of contributory negligence of the passengers justifying the court in submitting that issue under proper instructions. A review of many cases supporting this proposition are cited, indicating that it is presumed that a person possessing normal faculties of sight and hearing must have seen and heard that which was within the range of his sight and hearing, and it was a question for the jury to determine

whether the passengers should have heard or seen the train in time to have warned the driver. ▮ Here there was evidence that the bell was ringing and the whistle blowing; and the engine's headlight was observed at the distance indicated by the passengers. Most of them were familiar with the railroad crossing and knew of the posted signs and of the tracks. We conclude that the question of the contributory negligence of the passengers should have been left to the jury under proper instructions.

▮ In view of the errors, the close questions involving defendant's liability, and the possibility that the verdicts rendered might be the result of a compromise, a new trial on all issues should be had. (*Keogh* v. *Maulding*, 52 Cal.App. 2d 17, 21 [125 P.2d 858] ; *Shurman* v. *Fresno Ice Rink*, 91 Cal.App.2d 469 [205 P.2d 77] ; *Crawford* v. *Alioto*, 105 Cal. App.2d 45, 51 [233 P.2d 148].)

Judgment reversed and a new trial ordered on all issues. Defendant to recover costs on appeal.

Shepard, J., and Coughlin, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.